Case No. 24-7000 MPC No. 185 Open Internet Rule 24-3449 Ohio Telecom Association et al. v. FCC et al. 24-3450 Ohio Cable Telecommunications v. FCC et al. 24-3508 CTIA The Wireless Association v. FCC et al. 24-3510 Wireless Internet Service v. FCC et al. 24-3511 ACA Connects v. FCC et al. 24-3519 Florida Internet and Television v. FCC et al. 24-3538 Texas Cable Association et al. v. FCC et al. Mr. Wall, you may proceed for the petitioners. Good morning. Good morning. Judge Griffin, and may it please the Court, Jeff Wall for the petitioners. Obviously, there are many of them. I do wish, I believe I reserved eight minutes for rebuttal. Both sides here agree on one thing. Internet access is a hugely significant part of American life and one of the nation's most important industries. Simply put, subjecting that entire industry to public utility-style regulation presents a major question, as a panel of this Court already concluded. The Commission claims authority that for decades no one thought it had and that Congress has consistently refused to give it. That's exactly what the major questions doctrine is. I'll just tell you up front, I'm much more interested in what the words mean this morning than a doctrine which makes us look to something other than what the words mean. I mean, we could talk about that later, maybe, but speaking for myself, I'm going to be pretty impatient until we actually talk about the words. I also have a question of the major questions doctrine post-Chevron. I mean, I see the Supreme Court as establishing the doctrine to counter Chevron, and I recognize that the Supreme Court has not abrogated the doctrine post-Chevron, but does it make any sense to apply it post-Chevron? So I think it does. Let me take those points in reverse order. Judge Griffin, in loop or braid, the Supreme Court approvingly cited West Virginia and said, if you're delegating something of political and economic significance, it's got to be clear. See West Virginia. Well, that's the argument of why you overrule Chevron, right? All respect, I think it is a recognition that the Supreme Court does not see any tension, and this is my point to Judge Kethledge, and then I promise I'll go to the text, which is I think the Supreme Court, like sort of any clear statement rule, sees this as about the best way to read text in these circumstances. I mean, yeah. I mean, there's Justice Barrett's view about linguistic canon. It's not a dice-loading canon, in her view. And then there's a sense that it might be a clear statement rule, but be all that as it may. You know, after 16 years as a judge, let's just talk about the words. Well, Judge Kethledge is focused almost exclusively on the text, but I am interested in the text as well, but I'm also interested in major question, one, whether it's still viable, and two, whether it's determinative in your view. So you could spend a little bit of time. I agree. Because I am interested in that. So I do think it still applies post-Loper Bright. I think the reasons that the court overturned Chevron do not undermine why it adopted the major questions doctrine, and the Supreme Court has indicated it still applies. I have complete confidence that the Supreme Court has not gotten rid of the major questions doctrine and would apply it in a case tomorrow if it thought that the conditions for that doctrine were triggered. Why does it apply here? Because I think the question major, the state panel got that right. Yes, it's a question of huge economic and political significance, and in the words of the court, What time period do you look at for the major questions doctrine? What time period is relevant for when you determine when it's major? So I think it's when the agency takes the action at issue. Why is that? Why shouldn't it be when Congress passed the statute? Judge Bush, what I was about to say is I don't think it matters here. I think trying to classify Well, I mean, the Internet was not quite what it is today in 1996. It wasn't I remember 1996. I unfortunately do too. I learned about, you know, AOL and whatnot. So it was a very different animal back then. Was it really that significant? Yes, it was. I mean, here they wrote into the statute that they wanted a deregulatory policy. The statute actually says in its text, We want these services to be unfettered by federal and state regulation. And there are other sections of the act that deal with interactive computer services, and everyone acknowledges that in those sections, Congress said don't treat the Internet access providers as common carriers. Congress knew about the Internet. It wasn't the thing it is now, but it was a very big and nascent thing even at the time. If you look at the Stevens Report, what the Commission says in the Stevens Report, this is back in 1998, but looking at data from 1995-1996, already 85% of it is surfing the Web. It's not just the sort of applications that they've pointed to. So Congress knew about it. It knew what was coming down the pike. And it said to the federal government, hands off. We want this to develop through the market, not through regulation. I do think the major questions doctrine is dispositive, Judge Griffin, for the reasons that the state panel gave. It is a major question, and I don't see how in the face of every Commission until 2015 saying that it's Title I, all of the justices in Brand X believing that it was Title I, and the chief judge of this court saying we're right on the text, I don't see how they can say it's clear for them. I do think that's dispositive. But to go to the text, Judge Kavlage, I think we have by far the most natural reading of the text for the reasons that Chief Judge Sutton gave in his concurrence at the state stage. This is a statute that sets it up by saying, okay, we have telecommunications. We know that. Then they divide it into telecommunications services or information services. That's at page 1A of the Statutory Appendix. I have it right in front of me. Yep, and everybody agrees it's a mutual exclusive. So the question is, when you offer the telecommunications, are you also offering the capability to do various things with electronic information? And I think as an ordinary meeting English, we have by far the best reading of that. If you ask, the Smithsonian has speakers come in from the outside. Would you say the Smithsonian offers the capability to acquire knowledge? Any ordinary speaker would. We often refer both to the facilitator and to the content provider as offering the necessary capability. They are both necessary to the offering. And we know that's how consumers perceive it, because if you asked anyone, and I'm a broadband subscriber, I've been for many years, both at home and on my cell phone, does buying broadband offer the capability to do the following things, I think anybody would say, yes, that's how I retrieve information. I mean, we have a bunch of verbs here. It's, you know, capability for generating, acquiring, storing, transforming, processing, retrieving, et cetera, or making available information via telecom. So if I go to the Wall Street Journal's webpage, you know, let's just say it's on a desktop to not get into the mobile stuff. Can you walk me through, in your view, which one of these verbs I'm engaged in as I type in, let's say I type in their domain name, and then my broadband service brings to me the front page of the journal. Can you walk me through the words of the information service and explain how you think it's, you know, these things? I think the two most obvious for surfing the web, without getting into the workings of DNS for the moment, but I will turn to that separately, are acquiring and retrieving. When you're using email, you're storing and retrieving. When you're using a service like YouTube, you can be transforming or processing. And Judge Brown walks through this in her dissent from the denial of rehearing in the U.S. telecom case. She has a nice paragraph in that dissent where she walks through which of the gerunds are triggered by different services and then says, does broadband offer the capability to do those things? Yes, as a matter of ordinary English, it does. Now that's our first textual argument, Judge Kethledge. We also have, obviously, our second argument, which is you also have DNS and caching, which are information services, and they are an integrated part of the offering. That's a second. That's the Christopher You brief as well, right?  And he's explaining how the, I mean, so in your view, a domain name is not a point, right? I mean, telecom, telecom, the definition for that, telecommunications, telecommunications service, that's a transmission between points, right? That's right. And so now we're talking, I guess in the web world, are we talking figuratively? I mean, are these, are they points in a, you know, in a physical sense, ultimately, or what do you think? They are in the sense that you retrieve the information from servers that are located somewhere, but those servers can change depending on where the DNS points you or where you're cached.  So it is an actual physical location. I mean, it's not exactly like a cell phone in the sense that you're sort of targeting the one place or the phone in somebody's pocket. But I think what I would say, Judge Kethledge, is we've never thought that there are telecommunications because everybody agrees that even the information service, telecommunications is an input. So is there a transmission between points? There is for any of these services. The question that the statute asks is, is there only that transmission between points, or does that transmission offer the capability to do various things to the person using the service?  So tele, I mean, you know, it says via telecommunications. Right. Right. Somewhere, yeah, in the information service. Right. And so, and then, you know, telecommunications service is just offering of telecommunications, it's kind of circular, right? So, I mean, is it fair to say, and obviously I'd be interested in what the agency has to say, I mean, is it fair to say that telecommunications in this sense is simply the transmittal of information over, like, these, you know, lines, either wire or I guess whatever the in the air stuff is. The waves, yes, the waves, the in the air stuff. I think that's right. One small caveat, which is the telecommunications service does say telecommunications offer for a feed directly to the public, and there are some telecommunications offerings that are not directly to the public. So that, it's not entirely circular is all I'm saying, but it is, it's pretty close, I'm not going to, but to your question, yes. I think that the difficulty here is there's telecommunications no matter what, because there is transmission. Nobody's disputing that there is transmission, right? You're sending data packets across, whether it's waves or through the lines. The question is, is it only that, like a dumb pipe, or does it offer some capability to the person using the service to interact with electronic information, information online? And that has always been the sort of central feature of what started as enhanced services under Computer 2 and then became information services in the MFJ that was then codified in the 96 Act. It's always been understood as not just the voice thing transmitted back and forth, but are you interacting in some way with electronic online information? And if you are, you're an information service. And the history, I think, is quite good on this, Judge Kethledge. If you go back to the Stevens Report, and you look at paragraphs 73, 76, 79 to 81, you trace that forward to the DSL order in paragraphs 35 and 36. You then trace it forward further to the OT cable broadband order. You look at paragraphs 16 to 18 and 25. Then you trace it forward to the government's brief in brand X at page 5, and then to page 999 of that opinion. What the through line through all of those sources, if the court goes and looks at them, is that the internet access is an information service because it offers this capability, and the content providers are also offering information services. They're both. They're both part of the offering because they both offer the capability. The New York Times website offers it to you, and your broadband provider offers it to you. They're both part of offering that capability. And that starts as early as the Stevens Report. I mean, if you look, as I say, at these various paragraphs, like in paragraph 80, the provision of internet access service crucially involves information processing elements as well, and then in paragraph 76, subscribers can retrieve files from the web and browse their contents because their service provider offers the, quote, capability for, and then it quotes the information service definition. I mean, for 20 years, no one said that this was a telecommunications service.  Until 2015. That's right. Every justice in brand X premised it on the idea that there was some pizza there. There was just a question about whether you could unbundle the last mile transmission and make the folks that own the phone lines lease that to the non-facilities ISPs on a common carrier basis. But nobody disputed that the service to the end user, the letting them get on the internet, was an information service. So, I mean, just to make sure I understand the waterfront of your arguments about the statute, it's the capability aspect that you've just described, and it's also that the points aren't, or at least one of the points is not specified by the user. Is that right? We haven't made the user-specified point. That's in the amicus brief. We haven't focused on that part of the text. Then, I mean, what arguments have you made about the import of DNS and caching? So, we've said... I've read your briefs, trust me. But, you know, I don't remember everything. I would say we have two textual arguments and two contextual arguments that look at other provisions of the act. Our two textual arguments are, as a matter of ordinary meaning, we satisfy the definition of information service in section 153.24. Because of capability. Because of capability, it's ordinary meaning. It's consumer perception. This is the way we talk. We talk all the time about offering a capability, being the facilitator and the content provider. Then we have our argument about DNS and caching, which is you have information services that are integrated as part of the offering, as Chief Judge Sutton said at the stay stage. They're not add-ons, right? I've had broadband for many years. No one has ever asked me whether I would also like DNS. It is all part of what you are offered and the DNS and the caching are information services. So, another part of the service is I can just type in wsj.com and I don't have to, like, find and type in some tedious IP address. That's right. And there's no question, I think, I don't think, Mr. Lewis will dispute, that the DNS service offers the capability to process and retrieve information. It's just a question of, is it an integrated part of the offering that ISPs give to the consumer? And the answer to that is yes. And then the two contextual arguments, we have sections 230 and 231, where the same Congress and the same statute treated interactive computer services as information services, not telecommunication services. So, as Chief Judge Sutton says, Congress would have been speaking out of both sides of their mouths if they had given it a different meaning in this section. And we have the argument about mobile broadband. They have to go through interpretive gymnastics to say that mobile broadband is interconnected with the telephone network. And so, I think those are the four strongest reasons. That's helpful, that summary. What about management? You know, I mean, obviously, the definition of information service excludes any use of such capability, what you were just talking about, for the management control or operation. I mean, those are fairly broad general terms and they are not themselves defined, right, in the Act. And, I mean, that I could see as being an area where, I mean, if the agency had kind of established meaning and it applied over years based on its greater knowledge of what's happening on the ground, I mean, that could be an area for genuine skid more, like you earned it deference. So, what do you have to say? Why isn't DNS in management? So, three quick points. The first is that that would only apply to the DNS and caching, not to our frontline textual argument.  Second is, they have not had a consistent position on this. If you look at footnote two of their reply brief in Brand X in 2004 to the court, they told the court that DNS and caching do not fall within this exception. And my third point, they were right there for the reasons that Judge Millett gave in Mozilla. If you trace it back, this stems from the MFJ and it's identically worded to an exception in that modified final judgment and it is clear from the history behind the MFJ and the cases in Judge Green's opinion that that was internal facing operations, not sort of these services that aid the end user in using the product. What, again, gives us this internal facing idea because this is quite a gloss, you know, on this. What was the origin of this internal facing notion? The MFJ, when the judge entered this MFJ and adopted the sort of telecommunication services that then was Congress codified, carved out an exception for this and then they codified it in the statute. But I do, Judge Kessler, just want to go to the text of it just if you don't buy the history or anything else. When you say the management controller operation, the most natural meaning of that is that's the ISP managing or controlling its own internal service. I don't see how you can naturally say that about something like DNS where they say the users can swap out DNS themselves. Alright, well, that may mean that the users can do something to manage the system but you wouldn't naturally speak of that as the ISP managing its own service. It's offering something to the consumer and if the consumer wants to... It kind of raises the question of well, who's doing the management controller operation here and I'll be interested in what the agency has to say but, you know, it would seem a natural reading at least as I sit here that perhaps that's the ISP. I don't think the government in its brief disputes that when it refers to management controller operation it means the ISP. The dispute with the other side is the government just thinks that DNS naturally falls within the list of things that an ISP uses to manage its service and I don't think that makes sense in light of what it is. I mean, they really are managing where the information is stored so that the service provides, you know, the information more quickly to the user. I mean, I guess I could try to see an argument on caching but I have a really hard time on the DNS because it's an integrated part of the offering. It directs you to the other side. I get what you're saying. But what about CAT? I mean, does the response come to mind? I mean, they're doing that and the user's oblivious to it. I mean, yes, although it is still, it's not something that the ISP is doing to manage its own internal system. It's part of the service it provides to make sure that you get where you want to go. If I hand you a map. I can interrupt you. I mean, doesn't all this management operation ultimately have the purpose of providing a better service to the user? I mean, that's why you would go with the market, right? So, I guess I think that's my way. If you read it that broadly to say,  it's anything that enhances the end user's experience. I'm just looking for a principle. So, I think the principle is, is it a tool that the ISP uses to manage their own system? And if you go in and rent a car and they hand you a map to help you figure out where to go, no one thinks that that's part of HERTZ managing or operating its system. That's what it does with its own employees. And caching is like that. It's a way to help the end user get where they're trying to go more quickly. And I just don't think we would naturally refer to that as something an ISP does to manage their own system. It's part of the service to the end user. And I see those two things in terms of ordinary English as quite different. Alright, Mr. Wall, I see you're out of time. You could start your rebuttal now.  Alright, you'll have your eight minutes of rebuttal. Good morning. Good morning. May it please the Court, Jacob Lewis for the FCC and the United States. We agree this is a statutory interpretation case, not a major questions case. Major questions doctrine is triggered by an agency's unexpected claim to significant power. This case revolves around the Commission's identification of what a telecommunications service is. That's a fundamental definition in the Communications Act. It's not unexpected. It's right there in the middle of the Communications Act, and it's precisely what the Commission is charged to do. And you have to know for various other provisions of the Communications Act what a telecommunications service is. And you don't have to take my word for it. Petitioners in their reply brief concede that the Commission has the power to classify interstate telecommunications services. So if I could go to the statute, the statute... The major question doctrine, the changing positions of your client, of the FCC, throughout the years, doesn't that undermine your... Doesn't it show that the statute is ambiguous, that it's not clear? Well, I think it does show that the statute... There's a close question here. The statutory interpretation... Then if it's a close question, then doesn't the major doctrine... Well, our point is... Yeah, sorry. ...kick in? I mean, to resolve if it's equal on both sides, isn't that one of the factors, the major doctrine? Well, only if the doctrine applies. So there are two steps. One is, is it triggered? Is this case triggered by the major questions doctrine? Assuming... You say it doesn't, but assuming it does... Well, then... ...we get to the next step. And here, your client, through the years, has taken positions both ways. On the bottom line. On this. On the bottom line, but... The fact that the FCC says, well, one year it's this, one year it's that, is it clear that they have the authority there? So, yes, Your Honor, it is clear because the FCC... Even though you said so many times you didn't. Well, we said... We have changed... Obviously, the agency has had different views about the bottom line, about whether broadband Internet access services, telecommunications services... ...counsels strongly against it here. That's all. I think we have to distinguish between the bottom line conclusion about what broadband Internet access service should be classified, and the general authority, indeed, the necessity for the agency, as Congress expected, to decide whether it's an information service or a telecommunications service. So, even if the major questions doctrine applied, it's clear that Congress expected the Commission to identify services that fell within either category. So, the major question is not what the bottom line is. And the bottom line, by the way, would be significant either way. It is significant either way. If you decide that it's regulated under Title II, that brings its own consequences that Congress, again, specified. I mean, it is a little different than, say, like the employer vaccine mandate, you know, that OSHA promulgated, where, I mean, you read the OSHA statute and you wouldn't necessarily think this is something they must decide, like what vaccinations employers are going to get. But I do think you make a fair point that, you know, you have kind of two mutually exclusive categories here of all these communications service types of things. And the agency, in doing its work, is probably going to have to make classifications about, you know, each one of these, at least provisionally, subject to whether it's actually consistent. Right. We're a Federal Communications Commission. This is a communications act. These are fundamental definitions in the Communications Act. It would hardly be a surprise to anybody, including Congress, that the Commission would have to identify the services that are telecommunications services and information services. Would Congress be somewhat surprised that you take opposite positions over the years? But that goes to... Do you think that your client keeps changing its position? I think Congress might be surprised. Well, it might be surprising and it might divest us of all deference, which has gone anyway, on the issue. But you still... This Court still has to make its own choice about what the best reading of the statute... Would there be more deference to the agency decision that's closer in time to the statutory enactment? Well, Your Honor, I think the history is less clear than petitioners would have it point out. Very early on in 1998, after the Stevens Report, the Commission classified DSL service, which was an early type of broadband service, as a Title II service, not as a Title I service. How did DSL work again, real quick? Well, I think it used the phone lines to... It, through technology, allowed more faster transmission of information. Via telecom, obviously, but I remember it was like some faster thing. Right. It wasn't just your dial-up service. And then there's actually... In that era, the ISPs really didn't have any control over the transmission lines, did they? Weren't they just their own entities? Well, the ISPs also... And they also provided a lot of information when they provided access to the Internet. But they didn't really have the pipes. They were just the box. Yes. In many respects... Many of them didn't own their own facilities. There were some... And the Commission discussed this. There were some entities that did own their own facilities. But, yes, that was a different time. And that's actually a very important point about the interpretation here. The technology has enormously changed over time. But if I might point out that Loper Bright says, at one point, that when you really... Now the court's task is to look at the statute as if the agency hadn't made an interpretation. That actually happened here, when the Ninth Circuit first looked at what cable modem service should be. The Commission had not made an interpretation at that point. And the City of Portland case, the Ninth Circuit determined that cable modem service, which was a form of broadband, was a Title II service. That was without regard to any interpretation. So if one looks at the history, if you look at the DSL classification and you look at the City of Portland case, you see that, in fact, there had been early determinations that broadband was Title II. And Brand X says that while the Commission's contrary determination in Brand X was reasonable under a Chevron regime, it didn't disturb the Ninth Circuit's determination that that was not the best reading of the statute. So I think the history is much less clear than petitioners would have it. But the question here for the Court is, what does the statute mean on its face? And if I could just remind the Court of the definition of telecommunications, it's the transmission between or among points specified by the user of information of the user's choosing without change in the form or content of the information as set in receipt. That's what broadband providers offer, and that's what they provide. You expect that when you type in the web address, your request is going to be taken without change to that website. And if you're requesting information from the website, that that information will be transmitted back. But you understand the statute makes the distinction between telecommunications by itself and the words telecommunications service together. Title II is only for telecommunications service, correct? Well, but telecommunications service is a service... But it's a different meaning than the word telecommunications by itself. Would you agree with me? The statute makes the distinction between the two in the definition section. Well, but the definition of telecommunications service... Would you agree with me, though, that they're different definitions? Yes. Congress made specific... And I'm trying to just turn to my... Yes, and Title II is concerning telecommunications services, not telecommunications. Yes, but... Would you agree with me? Yes, I would agree only to the extent that it means... The definition means the offering of telecommunications for a fee to the public. So the only additional issues are whether it's offered for a fee to the public. And here, there's no dispute. You can have an information service that offers telecommunications, and that's different than a telecommunications service. Do you agree? Well, an information service, I think, does not... It offers that information via telecommunications. That's a definition of information service. The question here, and Brandeis said this was the entire question, is whether this is an integrated offering, whether the information service is offered as a package with the telecommunications or not. And the commission found here, on the basis of the record, that that's not what broadband providers today do. They offer and they market their services on the speed and reliability of that service. We're going to get you to the Internet quickly. We're going to get you... That's true, but they also offer information services, correct? Well, the information service is at the Web, is at the Internet. The petitioners are confusing the highway with the destination. They bring you to the Internet, but they are not the Internet. They don't offer them separately, do they? They offer them together. Well, only together in the sense that the petitioners are arguing that transmitting, transporting you to the Internet is giving you a capability. The capabilities are all in the Internet. Those Web sites are the things providing information services. It seems, I mean, I think the briefing in this case is just stellar. I mean, you both have done really a great job and really helped us a lot. I mean, when I read your brief, it seems to me you're saying that the broadband provider does not itself generate, transform, process, et cetera, information. Correct. And therefore, it's not providing an information service. Correct. And I guess to be very candid with you, the problem I have, and I always want people to tell me why I'm wrong, the problem I have with that is the word capability. That a broadband service is an information service, not only if it's doing the generating and processing, but if it offers a capability for the end user to have those things happen to information. And, I mean, if I get one of these services, I mean, they're opening, it's like a portal to all of this. And, I mean, like edge providers, to use this jargon, let's say the journal's editorial web page, the New York Times web page, I mean, they are doing a lot of the processing. If you go to the New York Times site and you do a search, I'm trying to find this one book review, and you type in the name of the book, and it comes up. I mean, they're doing a lot of processing and generating for you when you do that. That is not your broadband provider. It's the New York Times. But your broadband provider is giving you that capability by letting you get there on that highway. So what's wrong with that? I mean, why isn't that offering the capability from Spectrum or whatever it is, Spectrum offering you that you get the service and you can take our highway to a place where all these things happen and you have that capability. What's wrong with that? Well, you're taking the highway. If you took a bus to the library, you wouldn't... I don't want to do other metaphors. I mean, let's just try to talk about that. But I think it's important. There's a distinction. If capability is read that broadly, then it destroys the distinction between telecommunication service and information service, and it would make... How so? Well, it would just mean that every time you're... Like phone calls or telecom, right? That's right. And it would destroy the common notion that a telephone call is the paradigm telecommunications. I mean, a phone call is not... I mean, you're saying a phone call would be an information service, just like an old-fashioned phone call, landline to landline. A phone call can give you the capability to get information, whether it's information by calling up a relative about something that you needed to know or by... You think that's really what... I mean, people... The sort of ordinary meaning of offering a capability to call your aunt? I mean... Well, you get a lot of information in phone calls, but you also get a lot of information by, if you remember the old movie phone menu where you could call up and just get a menu thing. Nowadays, you can get your bank balance. You can find out, change and modify hotel reservations. All of those are performed using a traditional telephone. And yet, if you're going to interpret capability that broadly and that that provides a capability, then there's nothing... No, I get your point. Well, I'll let Judge Griffin go. I think there are good arguments on both sides, and I think there's a lot of ambiguity here. But in this situation, besides the fact that your client keeps changing positions on it, shouldn't we look to the federal policy of the 1996 Act which says that the policy of Congress is to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services unfettered by federal or state regulation? So, if it's a close call, should we not defer to the policy of Congress which is to not provide for extensive regulation? Well, a couple points. First of all, that policy statement is in a very specific provision of the 1996 Act which had a different legislative history, Section 230. But even taking that as a given... What I read is the policy of Congress. Right. Yes, Your Honor. I can understand what that means. I guess our second point, maybe a better point, is it was equally the policy of Congress to set forth those definitional provisions and to charge the Commission and the Court with determining what is the best reading of telecommunication service and information service. And I don't think the policy statement was meant to override those fundamental definitional provisions. And we have other sections, Section 706 of the same Act. What value do we place, if any, on the policy statement of Congress? Well, I think it's a general policy, but it's one that never would overrule the specific provisions of the statute. And it's stated in general terms, and I suppose if there was no answer, then you might say, well, you'd have to determine what... Okay. In this case, the Court decisions have gone both ways based on Chevron. Chevron, right. Have they not? Yes. And... All right. I wonder if we need to defer to Congress's policy here where it can go both ways, that's all. Well, I guess my... You say it's clear, but it obviously hasn't been cleared because Chevron has been the determinative factor in the prior cases. Right. I think the task for the Court now is to engage in the best reading of the statute, and I think the first-order question there is to look at those definitions and see whether the Commission's determination is correct. Policy comes in to inform, I suppose, but not where you have very specific definitions like the definition for telecommunications, telecommunications service, and information. Did the Ninth Circuit precedent you referenced the only court that has done, quote, the best reading of the statute? Up to now, Your Honor, yes. Because up to now, Chevron, this whole dispute and the Commission's orders were reviewed under Chevron, and the Court's determined it was a reasonable determination either way. But now the question for the Court is what's the best reading of the statute. All of the dissents or separate opinions from the D.C. Circuit were all based on major questions doctrine? Is that right? I think there was a, I don't, well, major questions doctrine came up in the denial of a rehearing in the U.S. Tele, I'm sorry, in Mozilla. The Rogers Brown. I'm sorry, the U.S. Telecommunications. The Rogers Brown opinion, was that based on a best reading of the statute? No, I think at that point Chevron was still alive. And, but there was a question about major questions, and Judge Srinivasan in the concurrence and denial of a rehearing in U.S. Telecom pointed out that the point that we're making here is that the major questions doctrine, even it was understood then, wouldn't apply because Congress clearly understood that the Commission would have to make these calls. And again, this is not, major questions cases have been when an agency is calling upon a really unexpected reading of the statute with a subtle or an ancillary provision. These are front and center provisions of the communications. I mean, yeah, okay, yeah. I get your point. May I ask you a question about definition of telecom? Yes. And this is not a trick question, it's kind of foundational. But the word points there, would you, it's kind of what I spoke to Mr. Wall about, would you agree that that's ultimately referring to some physical location somewhere for purposes of our, you know, that's what it means? Well, obviously the user types in a web address, and so it specifies the point by that request. Now, because of the way the Internet works, that could be just the same with an 800 call. You know, it could be answered in a number of different locations. But you're still specifying the point. In other words, you want to get to the New York Times website. Well, I'm not, and I'm not even getting to who is specifying the point. I'm just trying to, you know, to get to that, we need to understand what we mean by point. And given the nature of, you know, this ethereal nature of what we're talking about to some extent, I mean, is it ultimate, just so I can understand, it's not a trick question. I mean, is it ultimately a server somewhere that we're talking about? Yes, yes, that you would, an IP address would identify. Okay, so it's a server. It's some kind of, it's a server is the point. Yes. Okay, that's all. I just want to be able to. There's no sort of something in space, right? All of these websites are ultimately reside on computers somewhere, physical computers. Okay, that's helpful. Thanks. Mr. Lewis, you're out of time, but I'll give you a minute if you want to wrap up your argument. Well, I think I've covered what I want to say, Your Honor. I just would ask the court to review the commission's order, and we think it's the best reading of the statute. We think that's the issue in the case, and to deny the petitions for review. Can I ask a quick question? Any other questions? There's so much here. Ask away. How about this interactive computer definition in 230 F2 or whatever it is? Yeah, interactive computer service. Interactive computer service, 230 F2, is an information service, kind of an ellipsis as I've written in here, that provides access to the Internet. And so what do you think that means, and why wouldn't that suggest to us that at least some information, some services that provide access to the Internet, that access to the Internet is often, it's often an information service. There are at least instances, this would strongly seem to indicate, in which providing access to the Internet is an information service. So there are two issues with regard to 230 F2. First, I just want to get out that it says as used in this section. This is, as the D.C. Circuit said, a narrow purpose provision, and the Congress was quite, again, this was a section of the Act that had a different legislative history, had a specific legislative purpose. What was that? What is the island that this section is on? What was actually the Title V was the Communications Decency Act. It actually not only pointed to aspects of content moderation, but were also part of provisions of the statute. I guess that act didn't work too well. Well, it may not have. But I think because it had a very specific purpose, that's why Congress quite specifically in those definitions said, as used in this section. Well, that's a great point. So, and the second is that it doesn't, and maybe I'll just stick with my great point, but it doesn't map entirely. It just says interactive computer service is an information service system or access software. So it's not, it isn't just saying that it's an information service that provides or enables. There are these other things that could be. But I think I'd rest on my first point, which is they walled, Congress walled this off for precisely this purpose. They didn't want it. Well, that's all I have for you, sir. Any further questions, Judge? Appreciate it. Your agency gives us straight answers when you come here. I had that city of Eugene case. The last consolidated FCC petition in the country, I had that case. We got both, you know, that case, this case, I thought, and you all did a fine job there. Appreciate your straight answers. Thank you, Your Honor. All right. Counsel for the interveners. Good morning. Good morning, Your Honor. It's Daniel Woofter for the interveners, and thank you. I want to start with one definition in the statute that the parties haven't discussed yet, and this is at 153.51. This is the definition of a telecommunications carrier, and it says a telecommunications carrier means any provider of telecommunications services. A telecommunications carrier shall be treated as common carriage under this act only to the extent that it is engaged in providing telecommunications services. I think this is a very good indication that, in fact, the definition contemplates that these are not integrated, that these companies should be regulated as common carriage to the extent that they are providing this dumb pipe for fast speed. In addition... I noticed your definition uses the word telecommunications services. It doesn't just say telecommunications. Do you... Am I just blowing smoke here that there's no... You seem to be saying they're the same. Is that your position that when the statute says telecommunications, it's saying the same thing as telecommunications services? No, Your Honor. We agree with the parties that these are different definitions, but there are three relevant definitions, I think. There's telecommunications. That's at 50. There's telecommunications carrier that the parties didn't discuss. That's at 51. But the carrier definition you just gave uses the word telecommunications services. Correct. It doesn't ever use the word telecommunications by itself, correct? That is right. Okay. But what it says is that a telecommunications carrier shall be treated as common carriage under this act only to the extent... So to accept what the petitioners are arguing, this court and consumers would have to think that Verizon or AT&T aren't offering a dumb pipe at all. That all they're doing is offering... There is no extent to which that is part of the offer. But the fact that it says only to the extent is a good indication that this is not a single integrated offer. This should be viewed as two different offerings. I also want to address the point about the deregulatory policy of the act. And when you look at what Congress actually then did, they added a provision to Title II that requires forbearance where those provisions aren't necessary. It came to the agency, the deregulatory authority, and that was in response to MCI, which was decided two years before, which said that the agency did not have this forbearance authority in Congress. But it's not setting a default of total regulation in the agency back off. I mean, that's for sure in this act. I agree with that. I agree with that. And I do want to address a few of the major questions that came up. One, Judge Griffin, you had a point saying if the agency is changing its view back and forth, doesn't that just necessarily mean that the major questions doctrine should apply here? And I actually think it cuts the other way. Brand X was a major question... shows that this is not a major questions case because it said that the agency could make this choice back and forth. But at the time, the major questions doctrine had already been a well-established exception to the application of Chevron. In MCI, in Whitman, in Brown and Williamson, what the court said was we are not going to allow the agency to have this deference to go back and forth, even though there is an ambiguity in the statute or regardless of whether there's an ambiguity in the statute. And when it got to Brand X, the court just didn't do that. It just applied Chevron. Judge Bush, you asked a question about the relevant time frame. And I think there should be no question that the relevant time frame is from the view of the 96th Congress. And we also know that from Biden v. Missouri, where it rejected essentially this argument that, oh, this question is of such vast economic significance and political significance today that the agency shouldn't be allowed to require over 10 million health care workers to either get a vaccine or lose their job. And what the court said, no, no. Unprecedented circumstances are no reason to take away an authority that the agency has long been thought to have. And I also, I just wanted to make sure that I'm hitting all the points here. Oh, and finally, this is the last point, which is that there are multiple decisions now that have said that the best reading of this statute is that bias is a telecommunications service. You have the dissent from Justice Scalia in Brand X. You have the concurrence from Judge Millett in Mozilla. You have City of Portland. You have multiple textualist judges saying, no, no, a pet store that sells puppies with leashes is not just offering leashes. And you have, even if you were to view this as an integrated service, you have the opinion from Judge Millett saying no consumer today would think when they're buying fast access and speed and that it's marketed in that way, thinks that they're only, that they're not buying that at all. That in fact they're only getting information services. Can I ask a quick question? Sure. About your first point regarding 15351, the telecom carrier. A telecom carrier shall be treated as a common carrier under the Act only to the extent that it is engaged in providing telecom services. And you're saying that, so when, what's a, I mean, like name some provider, like what, Spectrum or whatever.  So Spectrum is providing a broadband service which people can use to access, you know, do a Google search. That information is obviously coming over wire lines or some kind of lines. And so it's a telecommunication service to that extent, right? And this definition expressly anticipates that all of this information manipulation will happen via telecom lines. And you're saying that, so that Spectrum is a Title II telecommunications carrier to the extent it's providing this information along these lines. But then to the extent that Spectrum is, well, to that extent they're a Title II carrier, you're saying, right?  But I mean, I guess, I mean, it's a really interesting point. And I'm just trying to think through it here. I mean, but information service, the definition itself comprises via telecom. It's not saying to the extent you're providing this information and doing all this stuff, manipulating information, and to the extent you're providing that end product information to the customer, you're not an information service. They're not saying that. The fact that it's being transported by telecom is part of the definition of information service, which is not part of Title II. So I'm not sure if I follow your point. I think the point there is that information service is agnostic as to whose telecom line it is being transmitted over. So if you access Google, Google doesn't care if you have AT&T or Verizon. It just is an information service because that information is being transmitted via telecommunications. It's like sort of an Internet 1.0 conception, right? Where it was like AOL and you have to, you hear the numbers dialing and you're there. I mean, well, okay, it's food for thought. I appreciate it. You covered a lot of ground in five minutes. Thank you. Thank you, Counsel. Rebuttal? Thank you, Your Honor. So three quick points. Don't make Judge Kadlec too mad. I've had plenty of text to talk. After 16 years, we get to talk about what the best meaning is. My second point is about the text. But I do want to say a word about the major question doctrine because I do think it is binding law from the Supreme Court and I do think a panel of this court got it right at this stage unanimously. And I think they recognize this is a major question if we've ever seen one. And I take the commission's main answer, and it's brave to be, but we have classification authority. And that, with all respect, Judge Kadlec, I don't think separates it from any of the major questions cases. The FDA said in Brown and Williamson, we have to decide if it's a device or a drug. We've got to classify tobacco one way or the other. OSHA said in the workplace cases, we have to tell you what an occupational hazard is. We've got to decide one way or the other. COVID-19 is in or it's out. The question remains, if one classification is a power grab by an agency and the other is not, it triggers the major question doctrine. I guess if I were arguing for the FCC on that very point, I might say that's true. I mean, all of these statutes require classifications. But what is surprising, what was surprising, say, in the Biden versus Nebraska case or Brown and Williamson, is that the agency would think this particular topic, this particular application, is something that needs to be classified in this regime. Like, you know, vaccines are something that we have to say is in or out of safety or, like, wait a minute, so like nicotine or cigarettes  are a drug, you know, that the FDA says is safe or not safe? I mean, the fact that the agency would think it needs to make a classification as to this thing is kind of what's surprising. Whereas that's really not true here. So I guess I have a different reaction, Judge Kethledge, because if I'm standing there in 2015 and for 20 years the world has been in two camps, phone service, which was basic service, or enhanced services, which allowed you to do something with information online, and for 20 years internet access has always been in the latter camp, and then you came in and said, actually, I'm moving it to basic service, that's where I think it belongs. Boy, I have the same reaction I have when you tell me tobacco is a drug after decades, or that COVID-19 is a workplace hazard. I think, no, that doesn't seem, and so I think it, you can't view it kind of too post hoc, but, you know, to turn to the text, I regret in the brief, Judge Kethledge, as I prepared for argument, that we didn't sort of spin out the argument that you were spinning out of one of your questions, because I do think that that's actually what the commission is doing. They're reading the content provider as doing the things, the list of gerunds and information service, and they are effectively reading out the word capability and asking whether you offer a capability. Their brief starts with the telecommunications definition and breaks it down and never really says, well, what's the capability mean there? And I still don't know what the commission thinks the ordinary meaning of offering that capability is and why it wouldn't cover Internet access service, when for 20 years, in document after document, they said this matches up with the natural meaning of the statute. On the telecommunications management exception, what I was trying to get at is that's adopted from the MFJ, and if you look at the Western Electric case that's cited at page 15 of our reply, that exception was adopted by the DDC there for, quote, internal operations, not services offered to the customer or end user. So it was understood much more narrowly in the MFJ context and that's what Congress codified in 96 and brought the old soil with it. The commission says again and again, well, what about Brand X? What about City of Portland? One quick, Chief Judge Sutton. What's an example of internal operations? As opposed to service for an end user. I mean, the policies and practices you have to manage your own employees in the way that maintains servers and things. This is, my overwhelming intuition is that this is something that, you know, it's not management of people, it's of a telecommunications system, that's what it says here. No, sorry, the way you're managing employees in maintaining the servers and the things that they do on your premises in order to maintain the telecommunications service. It sounds like something that's within the system itself. You're putting this in and then the system itself is kind of doing these things. Do you have a concrete example, contrast to the caching or DNS? No, I'd be happy to supplement and brief it. I'd have to look back at MFJ to see what they meant by internal operations, but the contrast was with the service to the end user, and it seems to me whatever we think, the DNS and the caching fall on the service to end user side of that distinction. I'll look at that MSJ. That's helpful, that history, that this just doesn't come out of nowhere. I do think when the Commission goes back time and again to cases like Portland and Brandeis, and this point's really important, and Chief Judge Sutton made it at the stay stage, those cases are not about the question here. Everyone accepts in those cases, because there's no dispute, that the Internet access service is an information service. The question is do you have to unbundle the last mile of transmission to the consumer and treat that last mile as a telecommunications service so that you have an obligation as a common carrier to lease it to the ISPs that don't own the phone lines on a common carrier, non-discriminatory basis. That's the only dispute in those cases. And the agency went back and forth on that. In the DSL order, if you look at paragraphs 35 and 36, they say the Internet access is an information service. The last mile we'll treat as an unbundled telecommunications service. Then in 02, they flip on that in the cable broadband order, and the court affirms it in Brandeis. But no one is looking at this question, because for 20 years, everybody understood that whether or not you could unbundle delivery, to use Justice Scalia's analogy, there was pizza. There was information processing going on that was part of the Internet access. And it is not until 2015 that anybody pops up and questions that. And the last point I'll just leave the court with is, I do think it's important to take a step back for purposes of both major questions and a natural understanding of the text to understand what's going on here. In 2015, they said, this is about blocking, throttling, and paid prioritization. Those things are not a problem in the real world. We have no good examples of them. Then they came in, in this order, they offered a bunch of new rationales. They effectively abandoned all those in their brief. Cyber security, national security, it's no longer about that. We're back to the original. Blocking, throttling, paid prioritization. They're still not a problem in the real world. And it's important that the court understand that's a fig leaf. That's a key to unlock Title II. Notwithstanding this court stay, the commission has already opened notices of inquiry on what to do about data caps and data usage by ISPs and customer service by ISPs. This agency is championing it a bit to use its other Title II powers that it unlocks here to regulate all sorts of things about ISPs. What kind of plans they offer you, what cost, and all the rest. Well, So I guess my point, Judge Griffin, is just when Mr. Lewis says look, this is about the net neutrality rules, that's not really what the case is about. It's about unlocking a suite of government powers to take an industry that has historically been unregulated by the federal government and that the act says in the policy statement you read from, Judge Griffin, that Congress wanted to be unfettered and it is taking it into a world of heavy-handed regulation that will extend far beyond net neutrality. It will extend to everything about the Internet. And Judge Kavanaugh made this point when he dissented from denial in the D.C. Circuit. He said it wrests control of the Internet from consumers and ISPs and puts it in the government and he said that's indisputably a major rule under any plausible conception of the test. Whether as a matter of major questions or text, we think that this rule should be set aside. Thank you very much for your arguments. Case will be submitted.